UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

JEFFERY RAYMOND KRAUSE,

        Plaintiff,

v.                                                                                       Case No. 16-C-226

NANCY BERRYHILL,
Commissioner of Social Security,

        Defendant.

---

## DECISION AND ORDER

---

Plaintiff Jeffery Krause filed this action seeking judicial review of the Commissioner of Social Security's determination that he is no longer entitled to receive benefits under the Social Security Act. He claims that the ALJ failed to follow the correct procedure for reviewing a case involving fraud and failed to conduct a redetermination of his case in accordance with the Social Security Act. Finding any error harmless and substantial evidence to support the decision, I affirm.

## BACKGROUND

This case has a long and disturbing procedural history. This appeal is a review of the second iteration of Krause's claim to reinstate disability benefits notwithstanding the Social Security Administration's (SSA) determination that the benefits were originally awarded on the basis of fraud. Krause first filed an application for a period of disability and disability insurance benefits (DIB) on October 21, 1997, alleging an onset date of March 7, 1995, when he was 28 years old. R. 1443, 1446. He claimed he injured his shoulder while working as a truck driver for the Village of Howard. R. 1444. After the SSA denied the request initially and upon reconsideration, Krause requested a

hearing before an ALJ. ALJ Arthur Schneider found that Krause had the following severe impairments: a shoulder lesion, rotator tendinitis, and spinal disc disease. *Id.* Krause underwent arthroscopic surgery with debridement of the right shoulder in May 1995. *Id.* He also claimed he began to develop lower back difficulties while enrolled in a physical therapy program and physicians noted that Krause had degenerative disc disease in his back and partial sacralization. R. 1444–45. The ALJ concluded that Krause was entitled to a closed period of disability from March 7, 1995 through November 10, 1997. Krause's disability award ceased on November 10, 1997 because the ALJ determined that Krause returned to substantial gainful activities. R. 1447. After a subsequent evaluation, however, the SSA determined that Krause was disabled because of his back disorder and was entitled to disability benefits as of October 8, 1999. R. 35.

In the meantime, Krause was also seeking disability payments through the Veterans Administration. Krause briefly served in the United States Marine Corps (USMC) from June 10, 1975 until November 3, 1976. R. 213. He was medically discharged for chronic lumbar strain, which the USMC Physical Evaluation Board determined was not incurred in or aggravated by service. On November 11, 1976, Krause submitted a claim for VA benefits listing his disabilities as "stomach trouble" and "warts." *Id.* In a rating decision dated February 27, 1977, the VA denied Krause's claim and further discussed his recurrent low back pain. The VA board noted that Krause had been in an automobile accident in April 1973 and agreed with the USMC that the condition existed prior to military service and was not aggravated by his service. Krause took no other action to receive disability payments from the VA until May 2003 when he requested that his claim be reopened and reconsidered as being aggravated during military service.

After the VA again confirmed the denial of service-connection for chronic lumbar stain, Krause submitted a statement in support of his claim from a physician who stated that Krause's chronic back pain may have been initially caused by his military service. Krause further stated in a letter dated February 5, 2004 that he had been very active prior to service and that since his discharge he "tried several activities with out [sic] much success." R. 213–14. Krause underwent a Compensation and Pension (C&P) Exam on April 12, 2004 and told the examiner that he injured his back and shoulder while working for the Village of Howard and he retired on permanent disability. R. 214. The examiner concluded that Krause's "current disability is related to the work-related injury as well as with chronic aging and degenerative joint disease." *Id.* The VA again denied service-connection for chronic lumbar strain in a rating decision dated June 9, 2004. Krause requested a personal hearing and told the Decision Review Officer (DRO) that his back has become progressively worse from his discharge date. In a statement of the case dated July 14, 2005, the DRO concluded he did not find any error in the VA's decision after a review of all the evidence.

Undeterred, Krause submitted an appeal to the Board of Veterans' Appeals (BVA) on August 22, 2005 alleging that his back problems began while on active duty as a result of the vehicles he drove having "essentially no suspensions." *Id.* The VA notified Krause on March 1, 2006 that his appeal was being forwarded to the BVA in Washington, D.C. *Id.* Krause contacted U.S. Congressmen Steven Kagan and Mark Green in November 2006 in support of his claim. However, the BVA declined his claim on February 16, 2007. Krause submitted another appeal in April 2007 stating he continued to disagree with the VA. He submitted an exam report from Dr. Ronald Barnes in November 2007, in which he told Dr. Barnes that he could only walk for approximately half a block without resting, could stand less than five minutes, was unable to bend

3

to pick up objects, could not lift more than ten pounds, could only push a grocery cart if he was holding onto it, and could drive for approximately 15 to 30 minutes with frequent position changes. R. 214–15. In light of Dr. Barnes' report, the VA issued a rating decision on November 27, 2007 rating Krause as 20% disabled, service-connected for degenerative joint disease of the lumbar spine effective January 31, 2003. R. 215.

On November 26, 2007, Krause also submitted an application for individual unemployability stating he was unable to work and that the SSA rated him unable to work since 1995. In a rating decision dated February 16, 2008, the VA increased Krause's disability for service-connected for degenerative joint disease of the lumbar spine to 40%; rated Krause 40% disabled, service-connected for radiculopathy of the right lower extremity; and awarded individual unemployability, all retroactive to January 31, 2003. On March 27, 2008, the VA retroactively awarded Krause all benefits to November 29, 2002. Krause then requested in April 2008 that the VA award an effective date of March 5, 1995 for his lower extremity condition, award an effective date for his lumbar spine condition to November 3, 1976, and provide a VA Specially Adapted Housing Grant. On May 21, 2008, the VA awarded Krause disability ratings retroactively to November 29, 2002 and deferred its ruling on all other requests. In response, Krause once again noted that he wanted earlier effective dates for his conditions and the adaptive housing grant, as well as requesting individual unemployability with an effective date in 1995. The VA denied Krause's request for earlier effective dates and the housing grant and continued his current rating and entitlement to individual unemployability. R. 216.

The SSA conducted a continuing disability review (CDR) in 2009, with state agency consulting physician Mina Khorshidi completing a Physical Residual Functional Capacity

4

Assessment. R. 530–37. Dr. Khorshidi considered Krause's allegations concerning degenerative disc disease, retrolisthesis, radiculopathy, skin cancer, and left hip problems. R. 537. Krause complained of pain radiating into his legs and stated that he uses a cane, walls, shopping carts, and chairs to assist him with walking. *Id.* He also indicated that he spends most days lying down and cannot do sedentary work due to frequent position changes. *Id.* Dr. Khorshidi determined based on Krause's medical record that he could only lift less than 10 pounds occasionally or frequently, could stand and/or walk for less than 2 hours in an 8-hour workday, and could sit for less than 6 hours in an 8-hour workday. R. 531. The SSA determined Krause's disability continued on September 2, 2009. R. 26.

At the same time that the SSA determined that Krause's disability continued, the VA's Office of Inspector General (OIG) was in the midst of what would become an approximately year and a half long investigation into whether Krause was receiving VA and SSA benefits on the basis of false claims about his disability and inability to work. R. 212. The investigation arose from a Congressional referral from Senator Feingold's office and officially began on June 30, 2008. R. 213, 215. The investigation required the work of at least four different surveillance agents (SAs) and involved the interviews of 15 different witnesses.

The VA first met with the complainant Mike Hoppe on June 4, 2008. R. 216. Hoppe first met Krause in 1994 or 1995 and the two were neighbors at the time of the investigation. At some point between 1995 and 1997, Krause asked Hoppe how he was able to get benefits and if Hoppe had any suggestions. Hoppe questioned why Krause was seeking VA benefits because "he could not see anything wrong with [him]." *Id.* The two again discussed benefits in 2002 when Krause mentioned it looked as though the VA would not award him benefits and Hoppe again told him it

5

was because there was nothing wrong with him. Hoppe explained to the SA interviewing him that since that time, he's witnessed Krause on numerous occasions walk up the ten to twelve steps to his home unassisted and as well as bend, lift heavy objects, and crawl under a tractor. On July 6, 2008, Hoppe witnessed Krause loading a 4x8 foot sheet of plywood onto his trailer. R. 217. Krause allegedly told Hoppe that when he didn't work his back hurt but that he would not get a job because he would not be able to find a job that paid him $80,000 per year—the amount Krause received from pensions and disability payments. *Id.* Hoppe also recounted how another neighbor, Mike Day, observed Krause lift a 80 to 100 pound furnace by himself into a cart at a hardware store. *Id.*

The VA also conducted in-person surveillance of Krause as well as observing surveillance footage of Krause at local hardware stores. Among other things, Krause was observed: carrying boxes to and from the trunk of his car and up the stairs into his home with no signs of disability; loading lumber into the rear of his truck; doing yard work on the side of his home; carrying a box weighing approximately 25 pounds, placing it on a counter, and then lifting it into a cart; carrying two approximately 12 feet long pipes without support; pushing a cart containing three ceiling fans in boxes, bending and picking up the boxes for a sales associate to review the box, and placing the boxes back; and pushing a shopping cart containing a saw weighing approximately 40 pounds, lifting the saw, and loading the saw into his vehicle by himself. R. 218–20.

Finally, the VA utilized interviews as part of its investigation. Krause's wife revealed that he can lift items such as a 20-30 pound bag of dog food, that he drove his daughter from Wisconsin to Oregon for school, and that he did much of the work on the construction of their new home because "Who else was supposed to do the work?" R. 222. Krause's daughter stated that Krause drove for approximately 28 hours of their trip to Oregon, with the only stops for food, gas, and

6

lodging. R. 226. Krause's nephew stated that he never saw Krause use a cane or other device to aid him walking, never observed him showing signs of disability, but that he did see Krause doing work on his roof every spring and fall. R. 223. The village administrator for the Village of Howard observed Krause in 2008 climbing down a ladder holding a large framed window he removed from his prior house. R. 224. All of the other interviewees recounted situations where Krause engaged in physical activities that, were Krause's limitations as great as he claimed, he would clearly have been unable to perform. R. 222–27. Krause eventually admitted to an SA that he had exaggerated his disability in hopes of receiving greater VA benefits, in part because "his new house had cost more than expected and he needed the additional income." R. 220.

The VA severed all of Krause's service benefits effective August 1, 2010 and referred the case to the United States Attorney's Office for possible prosecution and/or civil remedy. R. 203, 206–11. The VA also provided a copy of the OIG report to the SSA, which initiated a CDR and concluded that Krause had committed fraud. R. 35. Krause's benefits were retroactively terminated back to August 1, 2009—just prior to Krause's most recent CDR determination. *Id.* Krause appealed the decision and requested a hearing before a State Agency Hearing Officer. *Id.* The Hearing Officer considered all available evidence, including Krause's statements and the medical record evidence, before determining that the VA's investigation "clearly contradicts claimant's statements of inability to engage in activities due to his conditions. The claimant was interviewed by VA investigators and admitted to exaggerating his disabilities in order to receive additional VA benefits. . . . Claimant was given the opportunity to review this report, his responses are taken into consideration but are found to be noncredible given the finding of fraud." R. 37. The Hearing

7

Officer concluded that Krause was not disabled on the basis of fraud. R. 43. Krause then requested a hearing before an ALJ.

On March 27, 2013, Krause appeared before ALJ Robert L. Bartelt, Jr. Krause testified that he first missed three years of work with a right shoulder injury and had several surgeries on that shoulder. R. 1401, 1403. While he was in rehab for his shoulder injury, Krause claimed that he aggravated his back. R. 1401. Specifically, he claimed that he has degenerative disk disease and spurs in his lower back. *Id.* Although one doctor offered to do fusion surgery, Krause testified that all the doctors he spoke with told him that surgery was not an option. R. 1402–03. He claimed that he cannot raise his right arm above his shoulder and his house was remodeled in 2008 to make the cabinets more accessible. R. 1404. He claimed that standing up or driving when hitting the bumps in the road aggravated his back injury. R. 1405. He testified that he could force himself to stay seated for up to 45 minutes without having to get up and stretch. R. 1406. Krause testified that he could probably walk only about 25 feet without assistance, but that he uses a wheeled walker or a cane in most situations. R. 1407–08. He claimed that his wife tries to get him out of the house two to three times a week to places like Walmart to do some walking, but that he usually just sits in the electric carts. R. 1414. He also testified that he used to volunteer for Disabled American Veterans by driving veterans to doctors' appointments, but had not been able to do so in at least the last three years. R. 1414–15.

In an 8-page decision issued April 23, 2013, the ALJ determined that Krause's disability benefits were properly terminated on August 1, 2009 on the basis of fraudulent claims of disability. R. 1452–59. Although the record included letters and residual functional capacity forms from treating sources since 2007 purporting to attest to Krause's several limitations, the ALJ concluded

8

that the opinions "run wildly counter to many of the other medical records and observed activities of claimant as noted in the OIG report." R. 1456. The ALJ noted that Krause only received conservative treatment for his back and shoulder complaints through chiropractic adjustments, physical therapy, acupuncture, epidural steroid injections, and pain medications. *Id.* Krause underwent bilateral bursectomies in August 2011 in conjunction with bursitis of his knees. R. 1043–44. The ALJ observed that Krause never underwent back surgery despite his complaints, and x-rays and MRI scans of the lumbar spine have shown only mild to moderate degenerative changes with no nerve root impingement. R. 1456. Dr. Steven Weinshel, a neurosurgeon, was unable to identify the source of Krause's alleged pain in 2009. R. 1207–08. During an orthopedic consultation in September 2012, Dr. Michael Collopy saw no need for orthopedic treatment. R. 1298. In sum, the ALJ found that the opinions of treating sources who lent their support to Krause's disability claims "have little if any correlation with the medical evidence and all appeared to be so extreme . . . as to be completely inconsistent with claimant's own admitted activities." R. 1457.

The ALJ also briefly addressed Krause's alleged mental impairments. He noted that Krause only began to complain of anxiety and depression at approximately the same time the Veterans Administration fraud investigation was taking place. R. 1457. Although John Duffin, Ph.D., opined in December 2012 that Krause had marked limitations regarding understanding, remembering and carrying out simple instructions, Krause or Duffin never supplied the ALJ with treatment records verifying Krause's alleged mental limitations. *Id.*

The ALJ summarized his position with the assertion that he did not believe it was necessary to delve into any extended discussion of Krause's medical records given the substance of the OIG

report. R. 1457. He suggested that he viewed the surveillance videos that were part of the record and "has observed on those claimant engage in walking, standing and lifting of items which, if one were to believe claimant's statements and the extreme limitations which had been offered by some of the treating sources, one would expect claimant to have been unable to perform." *Id.* The ALJ further noted that the surveillance at Krause's home showed him lifting and carrying boxes ranging from 20-30 pounds and bending at a 45 degree angle. R. 1457–58. The ALJ stated that pursuant to 20 C.F.R. § 404.1594(e)(1), he could find a claimant not disabled based solely upon the claimant committing fraud in obtaining any prior favorable determination. The ALJ ultimately concluded that "[t]he photos and videos do not lie, nor does the preponderance of the various witnesses' statements in the investigative report. Absent additional evidence to suggest otherwise, the undersigned finds that claimant had been fraudulently been receiving Social Security disability benefits since at least August of 2009." R. 1458.

After the Appeals Council affirmed the ALJ's decision, Krause filed a civil action in this Court alleging that the ALJ relied on evidence that was not provided to Krause. Specifically, Krause claimed that he was never provided with the surveillance videos the ALJ allegedly watched in formulating his decision and that the ALJ told Krause on the day of his hearing, off the record, that he should "forget about . . . benefits." R. 1433. The Commissioner agreed a new hearing was appropriate because it was unclear whether the Agency provided Krause with copies of the videos that were used as evidence against him and the case was remanded for further administrative proceedings. R. 1468–69. On October 29, 2014, the Appeals Council vacated the first hearing decision and remanded the case back to an ALJ for a new hearing and decision. R. 1460–61.

Krause did not appear at the second hearing before ALJ Bartelt, purportedly because he either had a doctor's appointment or was out of town on vacation. R. 1512.

In a 7-page decision issued November 2, 2015, the ALJ once again determined that Krause's disability ended on August 1, 2009 based on a finding of fraud. R. 1432–38. Krause did not submit any new evidence in support of his claim that he remained disabled. R. 1435. The ALJ therefore adopted the background discussion from his first hearing decision, particularly as to his discussion regarding the medical evidence of record and the OIG report. *Id.*

Based upon the evidence of record, the ALJ noted that his new decision would be one of clarification. *Id.* The ALJ explained that despite his statement to the contrary, he never actually viewed the surveillance videos in the OIG report and merely was reporting on the report's summaries and descriptions of the videos. *Id.* Prior to the second hearing on remand, Krause was provided with the opportunity to view the relevant videos. *Id.* The ALJ further explained that he did not tell Krause to "forget about . . . benefits" and that even if Krause misunderstood the ALJ, the remark allegedly took place off the record and was of no consequence. R. 1436. The ALJ also explained that his first decision concluded that fraud was adequately shown by the evidence in the OIG report and that Krause's admission about exaggerating his disabilities revealed an intent to defraud. *Id.* Finally, the ALJ observed that "[a]ny 'weighing' of evidence (testimonial or documentary) of alleged disability is no longer required" in light of the presence of fraud. R. 1437.

Based on these findings, the ALJ concluded that the record indicates fraud on the part of Krause since at least the time of the CDR in August 2009, that Krause has not presented contrary evidence to sufficiently overcome the indication of fraud, and that Krause's disability ended on August 1, 2009. R. 1437–38. Krause then commenced this action for judicial review.

11

**ANALYSIS**

The statute authorizing judicial review of decisions of the Commissioner of Social Security states that the findings of the Commissioner as to any fact, "if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is "such relevant evidence as a reasonable mind could accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811. The ALJ must provide a "logical bridge" between the evidence and his conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

**A. Retroactivity of SSR 16–1p**

Krause asserts that the ALJ failed to comply with 42 U.S.C. § 405(u) and SSR 16–1p in reviewing whether his disability continued. Ordinarily, an eight-step evaluation process is used to determine whether a claimant continues to be disabled, based largely on medical improvement. 20

C.F.R. § 404.1594. However at step five in the evaluation, the SSA may determine that an exception to medical improvement applies. 20 C.F.R. § 404.1594(f)(5). "If an exception from the second group of exceptions to medical improvement applies, [the claimant's] disability will be found to have ended." *Id.* The "Group II" fraud exception establishes that "[i]f the agency finds that any prior favorable determination or decision was obtained by fraud, the agency *may* find that the claimant is not disabled." 20 C.F.R. § 404.1594(e)(1) (emphasis added). The SSA is then required to "immediately redetermine the entitlement of individuals" to disability benefits "if there is reason to believe that fraud or similar fault was involved in the application of the individual for such benefits." 42 U.S.C. § 405(u)(1)(A). The SSA must "disregard any evidence if there is reason to believe that fraud or similar fault was involved in the providing of such evidence." § 405(u)(1)(B). The ALJ should then review the remaining non-fraudulent evidence to determine if it supports a finding of disability. § 405(u)(3).

Krause argues that the ALJ failed to properly redetermine his claim under the SSA's new ruling released in March 2016. SSR 16–1p; "Titles II and XVI: Fraud and Similar Fault Redeterminations Under Sections 205(u) and 1631(e)(7) of the Social Security Act," 2016 WL 1029284 (effective March 14, 2016). Krause contends that SSR 16–1p, which became effective approximately three years after the ALJ initially addressed this case and four months after the ALJ's most recent decision, should retroactively apply to the ALJ's decisions. Krause maintains that SSR 16–1p mandates the methodical classification of evidence the SSA must utilize to comply with redetermination under § 405(u). According to Krause, "[t]here is reason to believe that, if the prescribed evaluation of the evidence were carried out, that an impartial finder of fact would find

13

sufficient evidence in the record to show that Plaintiff has continued to be disabled under SSA rules since 1995." (ECF No. 13 at 7.)

The retroactivity of SSR 16–1p has not yet been addressed in this Circuit or elsewhere. As a general rule, "administrative rules will not be construed to have retroactive effect unless their language requires this result." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). However, new social security rulings should be applied to matters on appeal where the regulation clarifies, rather than changes, an existing policy. *Pope v. Shalala*, 998 F.2d 473, 782–83 (7th Cir. 1993), *overruled on other grounds by Johnson v. Apfel*, 189 F.3d 561 (7th Cir. 1999). The text of SSR 16–1p does not contain any provisions indicating that the SSA intended for the Ruling to apply retroactively, which means that it should only apply in this case if it merely clarifies existing policy.

Here, the SSA indicated that the purpose of SSR 16–1p is to "explain[ ] the process we use to redetermine an individual's entitlement to or eligibility for benefits when there is reason to believe that fraud or similar fault was involved in that individual's application for benefits." Courts "will defer to an agency's expressed intent that a regulation is clarifying unless the prior interpretation of the regulation or statute in question is patently inconsistent with the later one." *Pope*, 998 F.2d at 483. Although SSR 16–1p's statement of purpose frames the Ruling as simply explaining the process under which redeterminations should occur, the Ruling actually creates additional steps that an ALJ must follow in order to comply with § 405(u). For example, the new Ruling requires that the SSA "document the claim file with a description of the disregarded evidence and the reasons for disregarding the evidence." SSR 16–1p(C)(2)(f). By adding new requirements to comply with § 405(u), SSR 16–1p changes, not clarifies, existing SSA policy regarding redetermination of disability following a finding of fraud. Accordingly, SSR 16–1p does not apply retroactively to the

14

ALJ's decision in this case and the ALJ's failure to comply with the additional steps does not necessitate remand.

**B. Review of Non-Fraudulent Evidence**

Notwithstanding the application of SSR 16–1p, Krause also asserts that the ALJ failed to examine the non-fraudulent evidence of record to determine whether the evidence was sufficient to support a finding of disability. Krause claims that the ALJ erred by relying solely on § 404.1594(e)(1) to determine that he was no longer disabled and that the ALJ should have immediately redetermined Krause's entitlement to disability benefits by disregarding evidence deemed tainted by fraud and deciding whether the remaining evidence supported a finding of disability. *See* 42 U.S.C. §§ 405(u)(1), (3). He claims the ALJ instead skipped to the conclusion that Krause's disability benefits were properly terminated retroactively. Indeed, it appears that the ALJ believed a fraud determination <u>alone</u> was all that was required to terminate Krause's disability. *See* R. 1458 ("[I]f one commits a fraud in obtaining any prior favorable determination, one can find a claimant 'not disabled' for that very reason alone (i.e. § 404.1594(e)(1))."). The ALJ's understanding of the law was therefore possibly in error.

However to the extent the ALJ's recitation of the law may have been in error, his discussion of the medical record shows that any such error was harmless. *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (holding alleged error harmless since "any remand for explicit consideration of Skarbek's obesity would not affect the outcome of this case"). The ALJ's 2013 decision provided substantial evidence in support of his conclusion that Krause's disability was properly terminated in August 1, 2009, on the basis of fraud. The ALJ noted at the outset that many of the medical opinions which attested to Krause's several limitations ran "wildly counter to many of the other

15

medical records and observed activities of claimant as noted in the OIG report." R. 1456. He observed that Krause received conservative treatment for his back and shoulder complaints, was treated on occasion for basal cell cancer and melanoma, and underwent bilateral bursectomies. *Id.* The ALJ noted that Krause never underwent back surgery despite his complaints and that x-rays and MRI scans of the lumbar spine have shown only mild to moderate degenerative changes with no nerve root impingement. *Id.* He further weighed the medical opinions of the treating sources who supported Krause's disability complaints and concluded that "[a]ll of those endorsements have little if any correlation with the medical evidence and all appeared to be so extreme . . . as to be completely inconsistent with claimant's own admitted activities." R. 1457. The ALJ also raised Krause's alleged mental impairments and noted how the allegations of impairment first began when the VA investigation was taking place and that he has not received treatment records from one of the treating sources. *Id.* The ALJ contrasted the findings of Krause's treating sources with the evidence from the OIG report and concluded that absent additional evidence to suggest that Krause was actually disabled, the record before the ALJ supported the conclusion that Krause had been fraudulently receiving benefits. R. 1458.

Krause argues that the ALJ only referred to Krause's x-rays and MRI's in his decision and ignored discrepant reports of Krause's pain and how it affected his ability to function, such as a physical therapist's report in March 2009 which purported to show that Krause walked with a cane and showed frequent pain behaviors. Pl.'s Reply Br., ECF No. 19, at 2. Krause further points to another treating source's observations that he claims support a finding of disability, including: weight shifting while sitting; difficulty maintaining posture while standing; favoring one leg over another while standing; and walking with a cane. Pl.'s Br., ECF No. 13, at 8.

16

In light of the evidence compiled in the Comprehensive Report of Investigation by the OIG of the Department of Veterans Affairs, R. 112–240, however, these examples simply illustrate the susceptibility of the SSA bureaucracy to falling victim to a claimant's fraudulent claims. Treating physicians naturally take their patient's pain complaints at face value and base their diagnosis and treatment upon such complaints. The SSA's rulings and regulations require that the agency give controlling weight to the opinion of a treating physicians if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record . . . ." 20 C.F.R. § 1527(c)(2); SSR 96-2p, 1996 WL 374188. Even if not given controlling weight, the agency must still assess a treating physician's opinion using a checklist of factors that are inherently more favorable to treating physicians than the agency's consulting physicians who have no connection to the claimant. *Id*. And because disability records are shielded from the general public, only rarely will a disinterested member of the public become aware that a person he knows is not disabled is receiving benefits. It is even rarer that such a person is outraged enough to write a United States Senator and thereby generate an OIG investigation that yields clear evidence of fraud. That is what happened here.

In sum, the ALJ considered the medical evidence which supported a finding of disability, discounted that evidence in light of the OIG report and Krause's activities, and concluded that, absent evidence not present in the record which showed disability, the evidence of record did not support a finding of a disability. Implicit in the ALJ's discussion of the medical evidence and the substance of the OIG report is that the ALJ concluded that the vast majority of the evidence which supported Krause's claims was the product of Krause's fraudulent attempts to receive benefits. Accordingly, I conclude that the ALJ properly reviewed the remaining non-fraudulent-based

17

evidence of record in determining that Krause's disability ended in August 2009 on the basis of fraud. To the extent the ALJ erred by not explicitly conducting a redetermination of the evidence pursuant to § 405(u)(3), the error was harmless in light of the substantial evidence to support the finding that Krause's disability should be ceased retroactively in light of fraud.

## CONCLUSION

For the reasons given above, the decision of the Commissioner is **AFFIRMED**. The Clerk is directed to enter judgment forthwith.

Dated this   27th   day of July, 2017.

                                s/ William C. Griesbach
                                William C. Griesbach, Chief Judge
                                United States District Court